Maurice Vyvey v. Commissioner. Marie Vyvey v. Commissioner.
Vyvey v. Commissioner
Docket Nos. 32941, 32942.
United States Tax Court
1952 Tax Ct. Memo LEXIS 216; 11 T.C.M. (CCH) 494; T.C.M. (RIA) 52146; May 19, 1952
*216 Allan Pomeroy, Esq., and George V. Whittle, C.P.A., 1823 Smith Tower, Seattle, Wash., for the petitioners. John D. Picco, Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax and additions thereto of 50 per cent for fraud under section 293 (b) and of 6 per cent provided by section 294 (d) (2) for underestimating tax, as follows: Maurice Vyvey
Marie Vyvey
Year
Deficiency
294(d)(2)
293(b)
Deficiency
294(d)(2)
293(b)
1942
$ 428.98
$ 214.49
$ 428.98
$ 214.49
1943
859.63
429.82
867.80
433.90
1944
1,302.08
651.04
1,302.08
651.04
1945
4,769.84
$281.51
2,384.92
4,769.84
$281.51
2,384.92
1946
1,794.86
897.43
1,794.86
897.43
1947
1,084.88
68.54
542.44
980.38
58.83
490.19 It will only be necessary to decide two of the issues raised - one is whether a part of the deficiency for each year was due to fraud with intent to evade tax, and the other is whether the Commissioner overstated the community income of the petitioners for any of the years. Findings of Fact The petitioners were married in 1926 and *217 have lived since that time as husband and wife in Seattle, Washington. They have three children, the first born in 1928, the second in 1932, and the third in 1936. They filed timely, separate returns on the community property basis for the taxable years. They used a cash basis in filing those returns and they filed them with the collector of internal revenue for the district of Washington. The petitioners since their marriage have been engaged in the business of operating a bakery and for most of that time a delicatessen shop in connection with the bakery. Most of the bakery products were sold at retail in the shop. Maurice is and has been a member of and has attended meetings of a trade organization and is a subscriber to two trade papers. He is thoroughly familiar with the bakery business and has been for many years. Marie has been active with him in the business ever since their marriage, has taken part in various phases of that business, and has likewise been familiar with it for many years. Marie was born in Canada and came to the United States when she was about fourteen. She was married and divorced prior to her marriage to Maurice and she also became a naturalized citizen *218 prior to 1926. Maurice was born in Belgium in 1900 and came to the United States in 1920. He was employed in the bakery business and also did other work until some time in 1926 when he purchased a bakery business for himself. The petitioners' only source of income from 1926 through the taxable years was from the operation of their bakery, including the store and delicatessen shop in which they sold groceries, delicatessen items, soft drinks, beer and wine. The petitioners lived until about 1930 in a small space adjacent to the bakery. Later, they occupied rented quarters on the opposite side of the street, and finally, in 1939, they purchased their own home where they resided throughout the taxable years. They both worked long hours in the business although their hours were reduced somewhat as time went on. They operated the business seven days a week and never closed for Sundays or holidays. They had three or four employees at the beginning and later during busy seasons had as many as thirteen. Marie at the time she married Maurice had total assets of about $5,400, a small part of which she used to fit and furnish their living quarters. Maurice had total assets of about $6,500 *219 at the time he purchased the bakery. The purchase price of the bakery was $4,500 on which he paid $2,400 in cash and gave his note for the balance. He used his remaining assets to operate the business. The petitioners and their first born child went to Belgium for about six months in 1930 to visit Maurice's mother who advanced to him at that time $5,000 in American currency. She later reimbursed him for the expenses of their trip to Europe. The petitioners filed nontaxable income tax returns for all years from 1926 through 1941, except for the year 1939, for which year each paid $2.31 in tax. The petitioners purchased a home in Seattle in January 1939. The purchase price was $6,600 on which they made a down payment of $1,600. Five thousand of the balance was borrowed from the Washington Mutual Savings Bank and $400 of the down payment from another bank. The $400 loan was paid off prior to January 1, 1942. The principal of the $5,000 loan was reduced to about $2,800 prior to January 1, 1942, and the final payment of the principal was made on or before March 25, 1943. The petitioners entered into twenty-three conditional sales contracts during the period from September 30, 1926 through *220 October 1, 1941. The total of the purchase prices on those contracts was $8,065.17. The articles purchased included various equipment for the business such as cash registers, scales, slicers, refrigeration and display equipment, supplies, household furnishings, including two pianos, one in 1927 and one in 1940, a camera and photo supplies, and an automobile on which another automobile was traded in. Interest was charged on most of those contracts, on many the rate of interest was relatively high, service and other charges were made on some of them, and on the cash registers a 5 per cent discount would have been allowed for payment in cash on delivery. Maurice had an account at a bank for several years after he purchased the bakery, then for awhile he had no bank account, and thereafter he had various bank accounts. The account which he had during the taxable years was opened on January 17, 1938. He had a safety deposit box in a bank beginning in 1942. The petitioners at first kept their own books for their business, but about 1933 or 1934 employed a firm of public accountants to keep a ledger for them from which the firm made up their income tax returns. A public accountant, formerly *221 employed by that firm, took over the keeping of the books and the preparation of the returns in 1936 and has continued to do that work ever since. The only sources of information available to the accountant were check stubs and bank statements of the petitioners, and daily summaries of cash received and disbursed made up by the petitioners and furnished to the accountant monthly. He was not shown any original records of the many cash transactions of the business. The books kept by him did not reflect all of the transactions of the business or all of the income of the business, and did not correctly reflect the income of the business during the taxable years or during prior years. The returns which he prepared and which the petitioners filed for the taxable years did not report all of the income of the business and did not correctly reflect the income of the business. Each of those returns was false and fraudulent with intent to evade tax. The petitioners, in April 1945, purchased the building in which their business was carried on and thereafter continued to have their business occupy a part of that building. They thereafter rented the remaining portion of the building. The purchase *222 price of the building was $40,000. The petitioners paid $20,000 of that amount upon signing the contract and thereafter paid off the balance of $20,000 in monthly payments of $1,000. They expended an additional $42,500 during the years 1945, 1946, and 1947 in remodeling and renovating the building. Maurice borrowed $10,000 from the Peoples National Bank of Washington on April 9, 1946 in connection with the remodeling and renovating. Five thousand dollars of the principal of the loan was repaid in October 1946. The balance was not repaid during the taxable years. Maurice, in applying for that loan, signed a statement in which his net worth was given at $105,432 and his net income for 1945 at $18,000. Investments in real estate were first shown in the investment account of the business, and later were shown in a separate real estate investment account. The transfer from the one account to the other was made in 1946. Agents of the Commissioner began an investigation of the income tax liability of the petitioners for the years 1942 through 1947 in May 1947. Their investigation was completed about a year later. The only records of the business made available to them were those kept *223 by the public accountant. Maurice told them that some original records including purchase invoices, deposit slips, cash register tapes, and other supporting memoranda had become wet and moldy during the remodeling of the bakery and had been destroyed. Actually they were in existence at the time of the conversation and were destroyed later without ever having been shown to the agents. The agents were dissatisfied with the records of the business available to them and computed the income of the petitioners for the taxable years by reference to the annual increase in the net worth of the petitioners, plus living expenses. The reported net income and the determination of net income made by the Commissioner is shown in the following table which the parties have stipulated is correct in all respects except that it fails to show a loan of $950 received from the petitioners' son in 1945 which was owing during the remainder of the taxable years, and except that the petitioners contend that they had additional cash of $40,000 on hand at the beginning of the taxable period of which they contend that $5,000 went into the business account in 1944, $18,500 in 1945, $11,500 in 1946, and $5,000 in *224 1947: 12/31/41
12/31/42
12/31/43
12/31/44
12/31/45
Investment Account -
Bakery
$ 6,670.05
$12,637.61
$16,357.96
$17,586.82
$52,315.98
Investment Account -
Real estate
Home
6,600.00
6,600.00
6,600.00
6,600.00
6,600.00
Standard Insurance
Co. - Single premi-
um policy #99635
6,732.40
6,732.40
War bonds
937.50
1,518.75
2,812.50
3,393.75
Peoples National Bank
- N. Seattle Branch
Savings #2677
2,000.12
2,303.54
5,013.08
5,053.19
83.68
Bankers Union Life
Co., Class A stock
- 7 shares
175.00
175.00
175.00
175.00
175.00
Bankers Union Life
Co., Class B stock
- 10 shares
500.00
500.00
500.00
500.00
500.00
Washington Mutual
Savings Bk. #87059
2,856.47
4,900.84
274.14
Buick automobile
1,600.00
1,600.00
1,600.00
1,600.00
1,600.00
Total Assets
$17,545.17
$24,753.65
$34,621.26
$45,960.75
$71,674.95
Liabilities
Mortgage on home
$ 2,768.43
$ 1,682.78
Net worth
$14,776.74
$23,070.87
$34,621.26
$45,960.75
$71,674.95
Increase in net worth
$ 8,294.13
$11,550.39
$11,339.49
$25,714.20
Living expenses
4,534.37
6,918.24
6,836.75
8,853.57
Total
$12,828.50
$18,468.63
$18,176.24
$34,567.77
Less: Proceeds
from cash sur-
render of life
insurance
1,104.40
Total known income
$12,828.50
$18,468.63
$18,176.24
$33,463.37
Income reported
9,326.93
13,020.35
9,353.87
7,254.11
Unreported income
$ 3,501.57
$ 5,448.28
$ 8,822.37
$26,209.26
*225 12/31/46
12/31/47
Investment Account -
Bakery
$ 8,100.04
$11,277.44
Investment Account -
Real estate
66,014.46
70,103.78
Home
6,600.00
6,600.00
Standard Insurance
Co. - Single premi-
um policy #99635
6,732.40
6,732.40
War bonds
112.50
112.50
Peoples National Bank - N. Seattle Branch
Savings #2677
84.93
86.19
Bankers Union Life
Co., Class A stock
- 7 shares
175.00
175.00
Bankers Union Life
Co., Class B Stock - 10 shares 500,00
500.00
Washington Mutual Savings Bk. #87059
279.64
1,545.67
Buick automobile
1,600.00
1,600.00
Total Assets
$90,198.97
$98,732.98
Liabilities
Mortgage on home
Net worth
$90,198.97
$98,732.98
Increase in net worth
$18,524.02
$8,534.01
Living expenses
5,942.41
9,714.07
Total
$24,466.43
$18,248.08
Less: Proceeds
from cash sur-
render of life
insurance
1,021.00
Total known income
$23,445.43
$18,248.08
Income reported
10,957.43
10,774.82
Unreported income
$12,488.00
$ 7,473.26
A part of each deficiency for each year was due to fraud with intent to evade tax. All facts stipulated by the parties are incorporated herein by this reference. Opinion MURDOCK, Judge: These *226 petitioners were required by law to file returns for each year reporting fully and honestly every item of gross income received by them. They were also required to keep adequate records of some kind to show themselves and the Commissioner the various income and deduction items. The Commissioner need not accept, as complete, correct and accurate, the returns filed and, if the returns and the records shown him are unreliable, he may, indeed must, seek other means of determining the correct tax liability. , aff'd , cert. den. ; , aff'd , cert. den. ; , aff'd on this point . The Commissioner has the burden of proving by clear and convincing evidence that at least a part of the deficiency for each year in the case of each petitioner was due to fraud with intent to evade tax. Direct evidence of a fraudulent intent is not necessary and seldom is available. Such intent, if present, may be shown by a clear inference drawn *227 from statements and actions of the party accused of the fraud. The drawing of such an inference can not be avoided in this case. The petitioners admit that their only source of income during the taxable years was the bakery and delicatessen operated by them jointly and they received no funds from other sources after 1931. The Commissioner, in determining the deficiencies and in holding that additions for fraud were due, did not rely on any books or records kept by or for the taxpayers. The only books or records which he was shown, in his efforts to audit the returns for the taxable years, was a ledger. They had employed a public accountant to keep such a record and to prepare their annual income tax returns from it. However they admit and it is a fact that neither the ledger nor the returns prepared from it correctly reflect the income of the petitioners from their business. The only sources of information made available to the accountant by the petitioners were their bank statements, their check stubs and daily summaries of their cash receipts and disbursements prepared by the petitioners and delivered monthly to the accountant. The entries in the *228 ledger correctly reflect the information furnished the accountant but that information did not fully disclose the business transactions of the petitioners. The accountant stamped on the returns "This return is prepared from the books of the client without audit of details contained therein." The accountant did not see or check during the taxable years any original records of daily sales, of daily purchases, or of other receipts or disbursements. Nor were representatives of the Commissioner able to check any such records. The petitioners concede that they had income during the taxable years not shown by the ledger or by their returns and that the ledger and their returns fail in other respects to reflect their actual income. The Commissioner was fully justified in determining the net income of the petitioners for each year from the annual increase in their net worth plus their annual living expenses. Facts stipulated by the parties aid the Commissioner materially in sustaining his burden of proof on the fraud issue. The petitioners thereby admit that they had income for each taxable year in excess of that shown on their ledger and on their returns as follows: $3,501.57 for 1942, $5,448.28 *229 for 1943, $3,822.37 for 1944, $6,759.26 for 1945, $988.00 for 1946, and $2,473.26 for 1947. The total of those amounts is $22,992.74. They explain that $2,700 of the total omitted, about $450 each year, was from the resale by them of lard barrels, egg crates, sugar and flour sacks, and milk containers in which they had received merchandise purchased by them. The cost, if any, of those containers was included in cost of goods sold shown on their ledger and on their returns but they did not tell the accountant of their receipts from the resales. Their excuse is that they did not know those receipts were income. Another $3,000 of the total omitted represented about $500 annually received as rebates from a dairy from which they purchased goods. The total purchases, before subtracting the rebates, went into their ledger and returns as cost of goods sold but they never told the accountant of the rebates. They gave no excuse for failing to report the rebates either as income or as a reduction of cost of goods sold. They testified that they took food from the store for family consumption. The cost to the business of that food went into cost of goods sold on their ledger and on their returns, *230 thus reducing net income, although the goods were not sold and nothing went into income to represent the food thus consumed, except for 1947 when they charged themselves with $1,200. Such explanations and excuses as the petitioners have given, for regularly understating their incomes by the admitted amounts which total $22,992.74 during the six taxable years, have been carefully considered in the light of the experience, intelligence, capabilities, and other characteristics of the petitioners and the limitations thereon shown by the record and after observing the petitioners during the trial. No explanation or excuse is given for a large part of the total admittedly omitted and those given are quite weak. Cf. . Our conclusion is that the petitioners knew that, year after year, they were not fully reporting their income and they deliberately understated it with the intention of avoiding tax. The conclusion that a part of each deficiency is due to fraud with intent to evade tax could stand on the admitted omission of $22,992.74 but the record contains other evidence supporting the fraud charge. The actual admitted omission, considering the *231 stipulation in the light of the testimony of the two petitioners, is a total of $27,992.74 instead of only $22,992.74. The parties have stipulated that the Commissioner's computation showing net income upon the basis of the annual increase in net worth plus living expenses is correct in all respects with two exceptions. One has been corrected in arriving at the $22,992.74 figure. The other is stated in the stipulation as follows: "$40,000.00 cash on hand on January 1, 1942: Petitioners contend that they had an additional cash on hand of $40,000.00 at the beginning of the period. This amount is in controversy. Petitioners further contend that of said funds, $5,000.00 went into the business account in the year 1944; $18,500.00 in the year 1945; $11,500.00 in the year 1946; and $5,000.00 in the year 1947." However, when the petitioners testified in regard to the additional cash allegedly on hand at the beginning of the taxable period the maximum amount which they would claim was $35,000. When asked about $40,000 Maurice repeatedly replied "$35,000". The $35,000 would have been exhausted by additional investments in the business prior to 1947 and the petitioners thus must be deemed *232 to admit that their income for the taxable years was understated by this additional $5,000, i.e. the total admitted understatement for the period was $27,992.74 rather than $22,992.74 as would otherwise appear. The petitioners offered no explanation or excuse for their failure to report the additional $5,000. The remaining question, bearing on the fraud issue and being the only question raised against the determination of the deficiencies, is whether, as the petitioners contend, they had $35,000 in a metal box kept hidden by Marie in their home on and before December 31, 1941 which was not reflected in the net worth statement for the beginning of the taxable years but which was invested in the business during the taxable years. If the petitioners' testimony on this point is fully believed, the income determined by the Commissioner would have to be reduced by the amount hoarded in the tin box since it was not reflected in the December 31, 1941 net worth. They say they lived frugally and saved all they could because they wanted to own real estate on which to operate their business. Such an attitude is understandable and commendable. They eventually succeeded. The question at this *233 point is - how did they do it, was it done entirely with earnings of the taxable years or partially with savings of prior years hoarded in the metal box. Maurice had nothing to put into the metal box after he purchased the business in 1926. The money which he then had in excess of his down payment on the purchase price of the business had to be used in the operation of the business. The $35,000 in the metal box is supposed to include, as nearly as can be determined from the record, about $5,000 owned by Marie at the time she was married to Maurice, $5,000 received by Maurice from his mother when he visited her in Belgium in 1930, and about $25,000 turned over to Marie by Maurice from unused earnings of the business mostly during the period 1926 through 1930. We will assume for the purpose of considering the fraud issue that the petitioners saved $5,000 of Marie's money and $5,000 obtained from Maurice's mother in 1930. However, the record is clear and convincing that they never saved an additional $25,000 between 1926 and the beginning of 1942. Maurice acquired the business at sometime in 1926. He testified that the annual community income for the years 1926 through 1930 was between *234 $4,000 and $6,000. The returns filed by the petitioners for the years 1926 through 1941 reported no tax due except tax of $4.62 for 1939. The maximum amount of nontaxable income which the community could have had during those years under the applicable revenue laws was $59,700. They have stipulated that their net worth, exclusive of the contents of the metal box, increased during that period by over $8,200. Not shown in that net worth statement are articles including two pianos, household furnishings and two automobiles which were purchased during that period at a total cost of more than $3,000. The petitioners have agreed that their living expenses for 1942 were $4,534.37 and if they had averaged two-thirds of that amount for the preceding sixteen years they would have consumed all of the balance of the total nontaxable net income which they could have received during those sixteen years. Other possible uses of income from the business during the period need not be considered since it is apparent that the petitioners could not have put $25,000 or even one-fifth of that amount of cash savings from the business into a metal box during the years 1926 through 1941. Thus if $25,000 was *235 put into the metal box from earnings of the business during that period, as claimed, taxable income for those years must have been understated by a like amount and the Court must make a choice whether to believe that there was such an understatement of taxable income and such savings accumulated during the prior years or whether the understatement occurred during the taxable years. No good reason appears for choosing the prior years as opposed to the taxable years, but on the contrary there is justification in the record for holding that the understatement occurred during the taxable years which were obviously more profitable ones. The record shows that Maurice has not always told the truth in connection with his business and finances. That circumstance casts doubt upon his testimony. Cf. . For example, the total community income reported for 1945 on returns filed on March 15, 1946 was $7,254.11 whereas on April 2, 1946, he signed an application for the $10,000 loan in which there was a statement that his income for 1945 amounted to $18,000. Maurice, on the witness stand, discounted the importance of his statements of his net worth given *236 in applications for loans by stating that they were "estimates" and he "exaggerated" in order to obtain the loans. In other words, his explanation is that he did not tell the truth when applying for loans. The petitioners testified before the Tax Court and before the District Court. They also were interviewed by the Revenue Agents. The story of their saving $35,000 in the metal box was not given by them in its entirety but came out somewhat piecemeal as they were examined by the Revenue Agents and by the attorneys in the two proceedings. The story as it now appears overtaxes our credulity. The two petitioners had to work hard during the early years to make a living. Maurice says he was called "stingy" and Marie even resisted his efforts to use their money in the purchase of a home and, to some extent, in the business. They were familiar with the use of savings and checking accounts in banks and also knew that a safe deposit box in a bank vault could be obtained as a safe depository for valuables. Maurice says that they were constantly fearful lest the contents of the metal box would be lost, stolen or destroyed by fire and that concern eventually moved him to obtain a safe deposit *237 box and put large amounts of cash in it along with other valuables. They said that Marie kept the metal box under laundry at the back of the hall closet in their home and in other similar hiding places. Yet they were away from those hiding places for long periods. The box allegedly made a trip from Seattle to Belgium and returned in a trunk entrusted to the usual transfer and transportation agencies and not carefully guarded by either petitioner. It is supposed to have contained something less than $30,000 when it went over and an additional $5,000 on the return trip. It is difficult to believe that people like these petitioners would take such risks with such a relatively large amount of cash. Also it is difficult to believe that they would borrow money, pay interest on the loans and that they would buy so many things on expensive installment sales contracts if all the time they had in the metal box more cash than they needed and could have avoided the payment of interest and could have made their purchases for less money by using that cash to buy a home, to buy furniture and equipment for the home and to buy and remodel the building in which they carried on their business. The Court *238 has not overlooked the possibility that the story of hoarding in the metal box is true but observation of the petitioners and consideration of the entire record has led it irresistibly to the conclusion that the story is not true and that at least $25,000 of the claimed $35,000 could not possibly have been on hand as hidden assets of the petitioners on December 31, 1941. This conclusion supports the one drawn earlier from admitted omissions of taxable income and further justifies the finding of fact, made from the entire record, that at least a part of each deficiency is due to fraud with intent to evade tax. The acquittal of these petitioners in a criminal proceeding in which they were charged with fraud for the same taxable years as are involved herein does not bar a holding that a part of each of these deficiencies was due to fraud with intent to evade taxes. , aff'd ; , aff'd . The petitioners operated the business together and one is as responsible for any fraud which may have been practiced as the other. They followed a consistent *239 practice of understating their income over a number of years. . They were reasonably intelligent and had had considerable business experience. They omitted almost as much as, if not more than, they reported. , affirming . Their records are inadequate and unreliable. The Commissioner has sustained his burden of proof on the fraud issue and as a result, it is unnecessary to consider an issue relating to the statute of limitations since there is no statutory period in case of fraud. The Court further holds that the petitioner has failed to show error in the determination of the deficiencies. Decisions will be entered under Rule 50.